# In the United States District Court
# for the
# Western District of Texas

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | 11-CR-673 |
| | § | |
| DAVID HERNANDEZ | § | |
| PRECIADO AND LUIS REYES | | |

**ORDER**

On this day came on to be considered Defendants' Motions to Suppress (docket nos. 34, 52 and 53).

**FINDINGS OF FACT**

1. On August 4, 2011, DPS Trooper Cipriani was patrolling IH 37 in Atascosa County. Cipriani has been employed as a highway patrolman for approximately four years, does highway duty on a daily basis, and has attended "interdiction" schools, where he has received training in body language and vehicle indicators to detect contraband. He was specifically patrolling this area (outside his usual territory) because he was assigned to a task force that brought in additional troopers to monitor this area for illegal activity.

2. At approximately 7:33 a.m., Trooper Cipriani stopped a pickup truck for speeding (72 mph in a 70 mph zone).[1] Prior to exiting his patrol vehicle, Trooper

---

[1] A camera located in the patrol vehicle was activated when the trooper turned on his overhead red-blue lights.

Cipriani noted the license plates and called in the number for a registration check. The check noted that the vehicle was not reported as stolen and was properly registered.

3. After stopping the vehicle, the driver, Hernandez-Preciado, exited the vehicle. Thereafter, Trooper Cipriani notified him that he was being stopped for speeding, requested his driver's license, and began questioning the driver (what was his current address, who was the passenger, where was he headed, where he was employed, whether he was married, etc.). Hernandez-Preciado stated that he was living in Harlingen (Rio Grande Valley). The license, however, reflected a Mesquite address (Dallas-Fort Worth area). Hernandez-Preciado stated that he was going to pick up his child for a vacation and that it was just a day trip (Harlingen-Mesquite-Harlingen). Trooper Cipriani noticed that Hernandez-Preciado's hands were trembling when he handed over his driver's license. Hernandez-Preciado stated that the owner of the vehicle was the passenger in the truck. Those questions lasted for about 2 minutes, 19 seconds.

4. Trooper Cipriani then began to question the passenger, Reyes, and requested insurance and driver's license information, asked about ownership of the vehicle, asked how long he knew Hernandez-Preciado, and asked about employment. Reyes stated that they were heading to Mesquite to pick up Hernandez-Preciado's son. Those questions lasted for about 4 minutes, 11 seconds.

5. Trooper Cipriani returned to question Hernandez-Preciado. Hernandez-Preciado confirmed portions of Reyes' statements, but Hernandez-Preciado gave

2

a different response to an earlier statement he made regarding where he was going to pick up his son (from the son's grandparents in Dallas or the boy's mom in Mesquite). Those questions lasted for about one minute.

6. Trooper Cipriani then submitted the driver's licenses via a computer located in his vehicle. An error message was received indicating a possible earlier FBI arrest. The computer later indicated that there were no outstanding warrants.

7. At 16:15 on the videotape, after Trooper Cipriani is aware that there are no outstanding warrants and the driver's licenses are "clear and valid", Trooper Cipriani returns to question both Defendants. Trooper Cipriani discovers that Reyes provides incorrect information regarding the truck's mileage. Trooper Cipriani then asked if there was anything illegal in the vehicle. Reyes responds that there was nothing illegal in the vehicle and that he was a Christian. Trooper Cipriani requests that Reyes state his favorite bible passage, but he was unable to do so. These questions last approximately 5 minutes. The Trooper then requested consent to search the truck from both defendants. Both defendants consented to the search (approximately 21:13 and 22:06 on the videotape).

8. After a 20 to 25 minute search, ten kilogram size packages of cocaine were found hidden in the tailgate (after noting that the tailgate was heavier than customary). At no time during the search did either Defendant withdraw the consent to search.

9. Upon discovering the cocaine, both Defendants were placed under arrest

and given their *Miranda* warnings in Spanish.

10. Trooper Cipriani testified that based upon his experience and training, he became suspicious of Hernandez-Preciado because he had a driver's license that listed a Mesquite address, but verbally claimed he had been living in Harlingen for about two months. Trooper Cipriani testified that Hernandez-Preciado's claim to work at a cleaners was suspicious because that type of employment was not unique to the Valley area. Trooper Cipriani also testified that Hernandez-Preciado's inconsistent response to where he was going to pick up his son (mother or grandparent's home) also caused him suspicion. Trooper Cipriani testified that Reyes made little eye contact and "he had papers in his hands that he was fidgeting with after he had already given me his insurance."

## CONCLUSIONS OF LAW

1. Any finding of fact herein above which also constitutes a conclusion of law is adopted as a conclusion of law. Any conclusion of law herein made which also constitutes a finding of fact is hereby adopted as a finding of fact.

2. The initial traffic stop for speeding was a valid reason for stopping the vehicle.

3. The stopping of a vehicle and detention of its occupants constitutes a "seizure" under the Fourth Amendment. The Fifth Circuit treats routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, as *Terry* stops. *U.S. v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004)(en banc). "Pursuant to *Terry*, the legality of police investigatory stops is tested in

4

two parts. Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506. The Supreme Court has stated that the "touchstone of Fourth Amendment analysis is reasonableness." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The Fifth Circuit, relying upon Supreme Court cases, has stated that reasonableness "requires a balancing of the public interest with an individual's right to be free from arbitrary intrusions by law enforcement." *Brigham*, 382 F.3d at 507. The Fifth Circuit has further stated that reasonableness "measured in objective terms by examining the totality of the circumstances, eschews bright-line rules, instead emphasizing the fact-specific nature of the inquiry." *Id*.

4. Under the second prong of the *Terry* test, the question before this court is whether the Trooper's actions after he legitimately stopped the vehicle were reasonably related to the circumstances that justified the stop, or to dispelling the reasonable suspicion developed during the stop. "This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Brigham*, 382 F. 3d at 507.

5. The Fifth Circuit has "found no constitutional impediment to a law enforcement officer's request to examine a driver's license and vehicle registration or rental papers during a traffic stop and to run a computer check

on both." *Id.* at 507-508. An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop. *Id.*; *see also U.S. v. Pack*, 612 F. 3d 341 (5th Cir.), modified, 622 F. 3d 383 (5th Cir. 2010). The Fifth Circuit has rejected "any notion that a police officer's questioning, even on a subject unrelated to the purpose of a routine traffic stop, is itself a Fourth Amendment violation." *Brigham*, 382 F.3d at 508.

6. The Fifth Circuit has rejected any "per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions." *Brigham*, 382 F. 3d at 511. The Fifth Circuit has also rejected any "stopwatch" test to determine the legality of a stop, stating there is "no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Id.* A "traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop." *Id.* at 512.

7. District courts are instructed "to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances."

*Id.* at 507. Courts are also cautioned that we "must allow law enforcement 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Id.*

8. Detention, however, may last no longer than required to effect the purpose of the stop. *U.S. v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006). "If all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop." *Id.* "A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id.*

9. In determining whether reasonable suspicion exists, courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. *U.S. v. Vasquez*, 253 Fed. Appx. 365, 370 (5th Cir. 2007). Reasonable suspicion may not be based on "inarticulate hunches of wrongdoing." *U.S. v. Thibodeaux*, 276 Fed. Appx. 372, 377 (5th Cir. 2008). The Fifth Circuit has held in a drug trafficking case that "mere uneasy feelings and inconsistent stories between a driver and a passenger do not constitute articulable facts that support a reasonable suspicion...." *U.S. v. Cavitt*, 550 F. 3d 430, 437 (5th Cir. 2008). The Fifth Circuit, however, has also held that a motorist's ankle slapping, shifty

eyes, shaky hands, and trembling body support a police officer's reasonable suspicion that a crime had been committed. *U.S. v. Wilkerson*, 405 Fed. Appx. 893 (5th Cir. 2010). The likelihood of criminal activity, however, "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *U.S. v. Pack*, 612 F. 3d at 352.

10. In this case, Trooper Cipriani offers various reasons why there was reasonable suspicion to extend the traffic stop beyond the time the driver would be issued a warning or citation for speeding.[2] Trooper Cipriani never indicated

---

[2] "The fact that his driver's license reflected a Mesquite address, and that he was living down in Harlingen for two months....The fact that he was driving up to Dallas and returning that same day with his son, who is getting ready to go to school in a couple of weeks, but he was bringing him back down there for vacation, that he gave me two different locations where his son was. Like I said the totality of the circumstances, everything taken into fact.... Q. How is that suspicious to you, that he is working in Harlingen he is separated from his wife, he is working in Harlingen, and has been working there for two months, and that made you suspicious? How? What is the indicator in your training that says this person is doing something illegal because he is working in Harlingen at a cleaners and not somewhere closer to his family? A. It is not that he is doing something illegal, but he is going down there to work for a dry-cleaners when - - if Mesquite is a suburb of Dallas, Dallas is pretty big. There are going to be a lot, a lot of dry-cleaners up there to work for. Why would he go how many ever hundred miles or whatever it is to go all the way down to Harlingen to work at this one specific dry-cleaners? That made me a little suspicious.... Q. Okay. So can you explain to me how that made you suspicious that he was bringing his child for two weeks? A. Because you have got a whole summer off, and he was just going up these last two weeks before his son goes to school, and picking him up and bringing him back.... Q. And was there anything off from what Mr. Reyes was telling you? A. As far as – Q. Whether the story was – A. No. Q. -- consistent? A. No, it was consistent. Q. Okay. And that didn't stop you from having a suspicion at all? A. No, sir. Q. Why? A. Because there were more indicators, just besides their stories being accurate. Q. And can you tell us what some of those indicators were? A. Lack of eye contact with the passenger as well, like I said, fidgeting with his hands, I mean – Q. Is that indicators for everybody? A. No, sir, it ain't. Q. And why was it, in this particular instance, an indicator? A. Because of what I had already talked to the passenger about, or correction, I'm sorry, Mr. Preciado, I was talking to him, okay, and noticed the same indicators with him.... Q. So - - okay. And the story is consistent, so we are good there. What else besides those two things? A. Okay. Can I finish? Okay. We got the driver. We have got the passenger. Okay. The fact that their story, dead on. I say - - you hear me say it myself later on in the video: The stories are dead on. It doesn't seem feasible. I mean, it seems possible, but it is unlikely reason for the trip. The cleanliness of the vehicle, the fact that only

to the driver, however, that he would or would not be issued a warning or citation for speeding. In addition, the Trooper's testimony as to what Hernandez told him about the location of his son and the pick up location was unclear.

11.     Relying upon *Brigham*, the Government argues that based on the above, "additional reasonable suspicion" arose in the course of the stop and before the initial purpose of the stop had been fulfilled, and that the continued detention was permissible until the new reasonable suspicion had been dispelled or confirmed. The Government further argues that this Court should not treat each reasonable suspicion factor in isolation, but consider the totality of the circumstances and the collective knowledge and experience of the officer.

The Fifth Circuit case law continues to develop in this area. Recently, the Court reversed a trial court's denial of a motion to suppress a firearm uncovered during a warrantless automobile search. *See U.S. v. Macias*, 658 F.3d 509 (5th Cir. 2011). In *Macias*, that defendant argued that before the officer ran the computer checks, the officer engaged in detailed questioning about matters unrelated to the defendant's driver's license, his proof of insurance, the vehicle registration, or the purpose and itinerary of his trip that unreasonably prolonged the detention without developing reasonable suspicion of additional criminal

---

-- I don't see any clothes in there. I don't see any baggage for clothes, but I see two small hygiene bags, which tells me, one, they either didn't brush their teeth and put on deodorant, or comb their hair or shower or whatever, or that they are going to be staying somewhere and they brought a little hygiene bag so that hey could brush their teeth, comb their hair, put on deodorant and shower."

9

activity. *Id.* at 518.³ The *Macias* Court determined that the unrelated questions impermissibly extended the duration of the stop. The Government argued that Trooper Barragan was permitted to ask these questions because, as soon as he stopped Macias, he had reasonable suspicion that Macias was involved in criminal activity.⁴ Distinguishing *Brigham*, the *Macias* Court stated that the Brigham officer's "*increasing* suspicion was also fueled by Brigham's extreme nervousness, his avoidance of eye contact, and his pattern of answering the officer's questions with questions of his own." *Brigham*, 382 F.3d at 508. Accordingly, the *Macias* Court found that the Brigham officer's questioning represented "a graduated response to emerging facts" whereas Trooper Barragan "could only point to Macias's extreme nervousness, which is not sufficient to support the extended detention." *Macias*, 658 F. 3d. at 520. The *Macias* Court also stated that "potentially undercutting Trooper Barragan's

---

³ The *Macias* Court found that "Trooper Barragan asked Macias if he currently was employed, what type of work he did, whether he owned his own business, and whether he had been in 'trouble' previously. Because Macias had informed Trooper Barragan that his trip to Victoria was medically-related, his job and an ambiguous question related to whether Macias had been in trouble previously had no apparent relation to the itinerary or purpose of the trip. Further, the video recording shows that Trooper Barragan asked Zillioux a series of questions in quick succession about how long her mother and Macias had been in a relationship, whether Macias had been in trouble previously, how many children Zillioux had, who was watching her children while she was away, why her mother had not accompanied her and Macias on the trip, and for whom she, her mother, and Macias worked. Trooper Barragan admitted at the suppression hearing that these questions were unrelated to Macias's failure to wear a seatbelt, the circumstance that justified the stop in the first place. Hence, it is clear that Trooper Barragan asked numerous unrelated questions." *Id.* at 519.

⁴ "When asked at the suppression hearing why he did not take Macias's driver's license, run the checks, write the citation, and allow Macias to proceed on his way, Trooper Barragan stated that he asked the questions because of Macias's '[e]xtreme signs of nervousness' and demeanor. Trooper Barragan testified that his 'suspicions of criminal activity taking place' were 'up,' and that based on his experience, Macias appeared to be unusually nervous. His signs of nervousness were manifested through avoidance of eye contact and failure to put the truck in park." *Id.*

reasonable suspicion is the Government's failure to present any evidence that sets out Trooper Barragan's experience." *Id*.

In this case, the Government established that Trooper Cipriani had four years of law enforcement experience, had conducted numerous vehicle stops and had attended "interdiction" schools, where he has received training in body language and vehicle indicators to detect contraband. The above notwithstanding, looking at the totality of the circumstances, Trooper Cipriani did not have a "particularized and objective basis for suspecting legal wrongdoing." *U.S. v. Vasquez*, 253 Fed. Appx. 365, 370 (5th Cir. 2007). Reasonable suspicion may not be based on "inarticulate hunches of wrongdoing." *U.S. v. Thibodeaux*, 276 Fed. Appx. 372, 377 (5th Cir. 2008). The Trooper had "mere uneasy feelings" about the believability of what he was being told. However, that does not constitute articulable facts that support a reasonable suspicion. *U.S. v. Cavitt*, 550 F. 3d 430, 437 (5th Cir. 2008).

11. The Defendants also challenge the search and argue that their consent was not voluntary and was not an independent act of free will. In evaluating the voluntariness of a consent, the Court looks to six factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *U.S. v. Shabazz*, 993 F.2d 431, 438 (5th Cir. 1993).

11

Although all six factors are relevant, no single factor is dispositive. *Id*. Although no coercive police procedures were used, and the Defendants were not in custody, they were not free to leave. The Defendants were cooperative with the police. The Defendants were asked whether they would consent to the search, implying that they did not have to give such consent. The Defendants understood all the questions being asked of them. The consent given by both Defendants was voluntary.

That, however, does not end the analysis. Even assuming that the Defendants' consent was voluntarily given, the consent was nevertheless not valid. Instead, the causal chain between the illegal detention and the Defendants' consent to Trooper Cipriani was not broken, and therefore the search was nonconsensual. And because there was no valid consent to search the vehicle, the evidence located during the search must be suppressed. *Macias*, 658 F.3d at 524.

## Conclusion

Defendants' motions to suppress are granted.

It is so ORDERED.

SIGNED this 20th day of December, 2011.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE